J. BEACH VREELAND, ELIZABETH D. V. GOULD and
ADELIA VREELAND

*v.*

J. PIERSON VREELAND.

1. To show delivery there must be proof of that which evinces an intention on the part of the grantor to part presently and unconditionally with the deed, and, of course, to pass the title to the land at once according to the terms of the deed.

2. Possession by the grantee of a deed, fully executed, is regarded as strong evidence of delivery, while on the other hand, where the deed is found in the possession of the grantor, his possession is regarded as furnishing equally strong evidence that it has not been delivered.

3. Delivery of a deed to a third person for the grantee, where the grantor parts with all control over the deed, makes the deed effectual from the instant of such delivery, even though the grantee is ignorant of its existence, for the law will presume, if nothing appears to the contrary, that a man will accept what is for his benefit.

4. Evidence, to be worthy of credit, must not only proceed from a credible source, but must, in addition, be credible in itself.

On final hearing on bill and answer and proofs taken orally.

*Mr. John S. Barkalow* and *Mr. Robert I. Hopper,* for the complainants.

*Mr. Francis Scott* and *Mr. George S. Hilton,* for the defendant.

VAN FLEET, V. C.

The principal litigants in this case are two sisters and a brother on one side and another brother on the other. Other persons have been made parties to the suit, but the persons mainly interested in its result are J. Beach Vreeland, Elizabeth D. V. Gould and Adelia Vreeland, the complainants, and J. Pierson Vreeland, the defendant. Cornelius D. Vreeland was the father of the four persons just named. He died intestate on the 6th day

Vreeland *v.* Vreeland.

of July, 1890, on his homestead farm near the city of Paterson. His wife had died some years before. The defendant and his family lived with Mr. Vreeland at the time of his death, and had for seven years prior thereto. Less than three years prior to his death, Mr. Vreeland was the owner of lands worth about $100,000. The important question of the case is, whether he was still the owner of these lands when he died. The complainants say that he was, and that the lands, on his death, descended to the defendant and themselves, in equal shares, while the defendant says that he was not, but that the fact is, that more than two years prior to his death he made effectual conveyances of all his lands. These contradictory assertions present the controlling issue of the case. It is not disputed that Mr. Vreeland signed and acknowledged deeds for all his lands some years before his death, but the fact in contest is, whether these deeds were ever delivered so as to give them legal life. The decision of that question will decide the only fact in controversy in this case.

Fifteen deeds are on trial. They are all voluntary. When they were made, they were unquestionably intended as a substitute for a will; the grantor undoubtedly meant that the lands described in them should, notwithstanding their execution, remain as completely subject to his present control and future disposition as though, instead of making deeds, he had, by a formal will, indicated what disposition he wanted made of his lands after his death. Seven of them were made to the defendant, six for lands in this state and one for lands in Missouri. Six of the seven were signed and acknowledged on the 28th day of April, 1887, and the other June 14th, 1884. Six are so drawn as to convey a present absolute estate in fee; the seventh, being the one last mentioned, bearing date June 14th, 1884, conveys the grantor's homestead farm to the defendant for life, with remainder in fee to his son Cornelius, subject, however, to the right of the grantor and his wife to remain on the farm and make it their home so long as they or either of them shall live. Three of the fifteen were made for the benefit of the grantor's son Beach. Two were signed and acknowledged April 28th,

1887, and the other bears date March 1st, 1887, and appears to have been acknowledged June 14th, 1887. One is so drawn as to convey a present estate in fee to Beach; the other two are made to Robert Garrison, and convey the legal title of the lands to Mr. Garrison, to be held in trust for Beach and his issue, and on failure of issue the lands are to go to other persons. Three were made for the benefit of the grantor's daughter Mrs. Gould. They all bear date April 28th, 1887, and appear to have been acknowledged on the same day. Two pass a present absolute estate in fee to Mrs. Gould, and the other grants a life estate to her, with remainder to her issue, and in case of the failure of issue the land is to go to other persons. The other two of the fifteen bear date April 28th, 1887, and appear to have been acknowledged on the same day. They convey the lands described in them to the defendant and Mrs. Gould, to be held in trust for the grantor's daughter Adelia for life, with remainder to her issue, and on failure of issue the lands are to go to other persons. It thus appears that thirteen of the fifteen deeds were made on the 28th day of April, 1887, one on the 14th day of June, 1887, and the other on the 14th day of June, 1884, so that one was made more than six years and the other fourteen more than three years prior to the grantor's death. None of those made to the complainants were delivered to them during the life of the grantor, nor did the grantor tell either of them that they had been delivered to any other person for them. Fourteen of the fifteen were found, a few hours after the grantor's death, in his trunk in the room where he died. The trunk was in his possession at the time of his death, and had been used by him, for many years, as his strong box, where he kept his valuable papers. The other, being one of the two made for the benefit of the grantor's daughter Adelia, was found, after the grantor's death, in the office of one of the counsel of the defendant, where the grantor had taken it to have a new deed drawn, in order that the trusts upon which the land should be held might be changed in important respects. Up to the day of his death, the grantor exercised full and complete dominion over all the lands described in these deeds. He dealt with them as their

owner. He took their income ; leased them ; paid the taxes on them ; insured the buildings on them and paid the premiums ; made such alterations in the buildings and such repairs as he thought proper, and paid the interest on the mortgages on the lands. Among his acts, directly affecting the lands covered by the deeds to the defendant, there are some so decisive in their character as to require special mention. On the 1st day of June, 1888, he made a lease of a part of the building standing on one of the tracts, in his own name as owner, for a term of ten years from the 1st day of September, 1888, at a rent of $1,600 a year ; and between February 22d, 1888, and December 20th, 1889, he insured the buildings on the several tracts in his own name as owner, for three years, in a sum exceeding $23,000. The lease was drawn from instructions furnished to the scrivener by the defendant. The facts stated in the foregoing summary are entirely free from dispute. If they constituted all the material facts of the case, there can be no doubt that it would be the duty of the court to adjudge the deeds to be worthless.

The rule is elementary that delivery is indispensably requisite to the validity of a deed, and that until it has been made the deed is without legal force and the title to the land remains in the grantor. What is meant, however, by delivery, according to this rule, as I understand the decisions, is not that the deed shall actually be handed by the grantor to the grantee, or to a third person for the grantee, but rather that such a condition of affairs shall exist as will clearly demonstrate that the grantor intended, at a particular point of time, that the title to the land should presently pass from himself to the grantee, and that the deed should at the same time become the property of the grantee. To illustrate : If, after A has agreed to convey a certain tract of land to B for a specific sum of money, they meet to perform the contract, and the deed is produced, examined and found to be satisfactory, and B then pays the purchase-money and A accepts it, the law will raise a conclusive presumption from A's acceptance of the purchase-money, if nothing to the contrary appears, that he meant to pass the title to B, and, as that could only be effected by the delivery of the deed, it will hold that

the deed has been delivered, though it may still remain in A's possession. But when the deed is voluntary and the grantor retains control over it, and keeps possession of the land, exercising complete dominion over it, no such presumption can be made. In such a case there is no ground for presumption, for the facts themselves show, incontestably, that the owner intends, at least for the present, to retain the title to the land and to keep control of the deed. The intention of the grantor is the only guide that the court can follow in cases of this class. "The essence of delivery," said the court of errors and appeals, in *Ruckman* v. *Ruckman, 6 Stew. Eq. 354, 358,* "consists in the intent of the grantor to perfect the instrument and make it at once the absolute property of the grantee. * * * Where there is not an actual transfer of the deed, it must satisfactorily appear, either from the circumstances of the transaction or the acts or words of the grantor, that it was his intention to part with the deed and put the title in the grantee." And Mr. Justice Van Syckel, in delivering the opinion of the supreme court, in *Jones* v. *Swayze, 13 Vr. 279,* said, in substance, that the question of delivery is a question of fact, which must be determined by the intention of the grantor, and that as soon as he does an act or speaks words, plainly showing that he intends that the deed shall presently bind him, and he, from that time forth, shall lose all right to further control it, it will be considered that the deed has been delivered. This case also decides, that a delivery to a third person for the grantee, where the grantor parts with all control over the deed, makes the deed effectual from the instant of such delivery, even though the grantee is ignorant of its existence, for it is said, the law will presume, if nothing appears to the contrary, that a man will accept what is for his benefit. In *Terhune* v. *Oldis, 17 Stew. Eq. 146, 150,* Chancellor McGill laid down the rule on this subject in a form as lucid and brief as I think it can be stated. He said: "To show delivery there must be proof of that which evinces an intention on the part of the grantor to part with the instrument, and, of course, to pass the title." And in *Ordinary* v. *Thatcher, 12 Vr. 403, 409,* Chief-Justice Beasley said, in substance, that the true theory is,

that a deed is delivered whenever it is intended that it shall go into effect by force of what is said or done, without any further future declaration or act. These citations make it plain, as I think, that unless the proofs satisfactorily show that Cornelius D. Vreeland did something or said something during his life which unmistakably manifested a decided intention on his part to give instant effect to the deeds in question, just in the form in which they were drawn, so that the title to the land should then pass to the grantees, and he be, from that time forth, without legal right to change or destroy them, it must be held that the deeds have not been delivered, and are, consequently, without legal force.

The fact that the deeds were, after the death of the grantor, found in his possession, and in the same place where he kept his other valuable papers, must, in the absence of all evidence to the contrary, be regarded as strong evidence that they had not been delivered. Possession by the grantee of a deed fully executed is regarded as strong evidence of delivery, while on the other hand, where the deed is found in the possession of the grantor, his possession is regarded as furnishing equally strong evidence that it has not been delivered; and where, as in this case, the evidence of non-delivery, arising from the possession of the deeds, is corroborated by the fact that the grantor retained possession of the lands up to the time of his death, and exercised complete dominion over them as owner, the proof of non-delivery would seem to be well-nigh conclusive. There can be no doubt then, that in a case where the evidence stands in this position, the burthen of proving delivery rests on the party claiming under the deed, and that he will not be entitled to prevail unless he establishes the fact of delivery by evidence greater in weight and more persuasive in force than that tending to prove non-delivery. As to the vital fact in controversy here it is clear that the burthen of proof is on the defendant. It is also clear, as I think, to justify an adjudication that the deeds in question are valid, the defendant's proof must be sufficiently strong and certain to produce a firm conviction, that, notwithstanding the convincing force of the facts tending to prove that the deeds had

not been delivered, still that the truth is there was a time, prior to the grantor's death, when he parted with the deeds with the deliberate intention, by such act, to divest himself of title to the lands and invest the grantees with it, and also to make the deeds the property of the grantees, so that, from that time forth, he should be without legal right to change or destroy them.

The question here is, do the proofs in support of delivery come up to this standard? The defendant says that the fifteen deeds in question, with two others, were delivered to him by his father, in his father's room in the homestead house, on the evening of the 9th day of January, 1888. No other person was present. The fact is not disputed that two deeds made to the defendant by his father were recorded on the 10th day of January, 1888, and that those two deeds, since that date, have been in the defendant's possession. The defendant on this date was engaged in business in Paterson. He had a store there, but resided, with his family, on his father's homestead farm, distant about four miles from Paterson. The following are the principal facts connected with the delivery of the deeds, as given by the defendant: He says that his father came to his store on the 9th day of January, 1888, and that after they had had a talk about some business matters, his father told him to go ahead, and then said: "I will give you your deeds and also the deeds for the other heirs; I am an old man, and it is absolutely necessary that I should deliver those deeds in person while living." He also says, after his return home that day, his father, in the evening, called him to his room, and that immediately after he entered the room, his father, in his presence, unlocked the trunk in which he kept his papers and took from it a tin box, and then from the tin box the seven deeds on which he rests his claim in this case, and handed them to him separately; and that as his father handed each deed to him he told him what property it conveyed; and that his father then handed him the tin box, saying, as he did so:

"Here are the deeds for Beach, Adelia and Lizzie; you take them and deliver them, after my death, as you find the names written on the packages. * * * I do not wish you to record them until after my death; then you take them and put them on record."

Vreeland v. Vreeland.

He says the reason his father gave for withholding the deeds from record until after his death was, that putting them on record might have the effect to injure his credit. He further says, that his father, immediately after saying that he did not wish the deeds recorded until after his death, also said :

"I have made no will; I have divided my property so that there can be no question; I do not know that you will have any trouble, but I am afraid that Beach will make trouble for you; I think Lizzie will stand by you—she will give no trouble—but now that she is married her husband may influence her."

He promised, he says, to obey his father's command not to record the deeds, by saying "all right," and then says that he said to his father, notwithstanding the warning his father had just uttered, that as the deeds were not to be recorded until after his father's death, he would put them back in the box, as they would be as safe there as anywhere. He says he put his deeds back in the box where the others were, put the box back into the trunk, locked the trunk and put it away in a closet in his father's room, and laid the key on a shelf of his father's book-case in the same room. When the trunk was unlocked, the defendant says he thinks his father took the key from his pocket, but he does not tell why he did not, after locking the trunk, return the key to his father instead of putting it in the book-case. The reason he gives for putting the deeds back into his father's possession, immediately after their delivery, is, that he wanted to let his father see that he would not record them with-out his knowledge. His father gave no direction as to where the deeds should be kept in the interval between their delivery and his death further than that expressed by his transfer of them to the defendant. From the 9th of January, 1888, the defendant admits that the deeds were never again in his posses-sion until the day of his father's death, and then not until his father had been dead some hours. He also admits that he and his father never afterward had any conversation respecting the deeds, nor was any allusion made to them, except on a single occasion, although they subsequently lived together in the same house and saw each other daily for nearly two years and a half.

That part of the defendant's story in which he attempts to explain why he put the deeds back into his father's possession almost the very instant they were delivered, and then left them there up to the time of his father's death, in the meantime acting precisely as he would have done if no tradition of the deeds had been made, stands in such sharp conflict, as it seems to me, with what a man of ordinary good sense and prudence would have been likely to have done under similar circumstances, as to shock the credulity of any mind of ordinary discrimination. The defendant has a much deeper interest in the result of this suit than any either of the other litigants. If he can maintain the validity of the deeds, he will take under them more than twice as much of his father's estate as he is entitled to as heir at law. He occupies, therefore, a position of great temptation, where his interest will naturally, even if he wants to be truthful, impress upon his memory with much greater distinctness those things which make in his favor than it will those which make against him. Now, the only reason he assigns for immediately restoring the deeds to his father's possession is, that he wanted to assure his father that the deeds should not be recorded contrary to his wishes. But this reason had no application to the deeds made to the other children. His interest, aside from the obligation imposed by the command of his father, made it perfectly certain that he would not record them. Beside, his father, even in respect to his own deeds, had asked for no such assurance; his conduct had, on the contrary, evinced, in the most unmistakable manner, that he did not want it, and that the offer of it would be much more likely to offend than please him. To credit the defendant's evidence on this point, it will be necessary for us to believe, as is obvious, that his desire to give his father a guaranty that the deeds should not be recorded contrary to his wishes, was so overpowering as to constrain him to do an act, which, it is plain, any person of ordinary acuteness of perception would have seen, would be quite certain to result in defeating what his father was attempting to do and what he was eager to help his father to do. We must believe that his desire to give his father this guaranty was so powerful, and so heedless of consequences,

as to constrain him to do an act which he could not fail to have seen would not only destroy, to a very great extent, all evidence of the delivery of the deeds, but tend to create evidence, possessing almost conclusive force, that they had not been delivered; and that he gave the guaranty in spite of the information his father had given him that very day that it was absolutely necessary that he should deliver the deeds while living, and also in spite of his father's warning, uttered but a moment before, that he was afraid Beach would make trouble about the deeds, and that it was possible Mrs. Gould might do so too. And we must also believe that Cornelius D. Vreeland, though he knew that a deed was without force until delivered, and for that reason he had just gone through the ceremony of making a formal delivery of these deeds, yet, that he nevertheless allowed the defendant, almost the very instant the delivery was completed, to return the deeds to his possession, and then afterward retained them continuously in his possession up to the time of his death, thus apparently willingly consenting that all evidence of the delivery of the deeds should be put in course of complete extinction as soon as it was made. These are things which it is hard to believe. They are improbable and unnatural, because they are contrary to common experience. Men of ordinary prudence do not act in this way, especially when they fear that what they are doing may be the subject of future judicial investigation. With such a fear in their minds, they will proceed with a cautious foresight and try to make evidence to sustain what they do rather than to make evidence inviting attack.

There is nothing in the defendant's conduct, as he himself describes it, which has the effect either to remove or lessen these difficulties; its effect is rather the other way. When his father delivered the deeds to him, he says, his father did not request him not to tell his brother and his two sisters that their deeds had been delivered to him. He says his father said nothing on that subject and he made no inquiry. Nor, when his father said that he was afraid Beach would make trouble, did he inquire what were the grounds of his fear, nor whether anything could be done to avert the trouble which he apprehended. And yet it

is manifest, that unless the defendant differs radically from the great mass of mankind, these were subjects in respect to which he would naturally be extremely curious to know his father's mind. The act, which he says his father had just performed, showed him that he was the child whom his father loved the most, and in whom he reposed the greatest confidence. By conveying to him more than half of his whole estate he gave him the highest possible evidence that he was his favorite child, and by making him the depositary of the deeds for his other children he manifested that his trust in him was almost unbounded. The natural effect of this display of affection and confidence was to give him an almost uncontrollable desire to know the whole mind of his father respecting the deeds, and to invite him to indulge in the utmost freedom of inquiry. It cannot be believed that he did not have a strong desire to know whether or not his father wanted his other children to know that the deeds had been delivered; nor that he was not eager to know why his father feared Beach might make trouble; nor can it be believed, in view of the confidential relations which he says existed at that time between his father and himself, that he would have refrained from making the most searching inquiry concerning these matters from a fear of offending his father by his inquisitiveness. It was necessary to the performance of the important duty, which his father had just imposed upon him, that he should be inquisitive—that he should be eager to know all that his father knew and desired—and yet he says he was not, or, at least, that his conduct was marked by an indifference and unconcern utterly inconsistent with the deep personal interest he had in the affair. The conduct which he ascribes to himself stands in such sharp conflict with what a man of ordinary selfishness and caution would have done under like circumstances as to put the mind in a state of painful doubt whether any such occurrence as he describes ever took place—whether the whole affair is not a fiction, having no foundation in fact. Evidence, to be worthy of credit, must not only proceed from a credible source, but must, in addition, be credible in itself. And by this is meant that it shall be so natural, reasonable and probable, in view of the

transaction which it describes or to which it relates, as to make it easy to believe it.

The defendant lacks neither craft nor greed. This is made plain by his conduct immediately succeeding his father's death. A few hours after his father's death he and Beach opened their father's trunk and examined some of the deeds in question. The defendant says Beach asked permission to take his deeds to Paterson, but that he refused to allow him to do so, saying: "We will lock all these things up and put them away, and leave them until such time as we can get together and go through father's papers." Shortly afterward, and before any further examination of his father's papers had been made, and without notifying Beach or either of his sisters that he intended to do so, the defendant secretly took from the trunk six of the deeds made to him and had them recorded. And a few days after his father's death he asked Beach to make over to him, by writing, and without consideration, his share of his father's personal estate, and he presented his request with such persuasive force that he induced Beach to yield to it. And he subsequently induced his sisters to make a like transfer to him.

These things, if they stood alone, would make it very difficult to believe that the deeds were delivered on the 9th of January, 1888, with the intention of presently perfecting them as convey-ances. But they do not stand alone; on the contrary, there is evidence going to show, with almost conclusive force, that if anything was done, at the time designated, at all resembling the transaction described by the defendant, it was done without the least intention on the part of the grantor to part with the control of the deeds, or to pass the title to the lands. An important part of this evidence proceeds from the defendant's own mouth. As has already been stated, the deeds were never the subject of conversation between the defendant and his father after the 9th of January, 1888, except on one occasion, and that conversation, the defendant says, occurred one evening in December, 1889. The defendant's son was present. The defendant says his father left the room, where the family were, to go, as he

supposed, to bed, but that he returned in a short time and said
to him:

> "I want to tell you, in the presence of your son, that in case of my death
> you are to take the deeds that are in my box and deliver them, as my agent,
> to the other heirs as you find the names written on the packages."

The son, in describing the same occurrence, says that his grand-
father said: "Pierson, I want you to deliver the deeds to those
whose names are written on the packages;" and that his grand-
father then turned to him and said: "I want you to witness
this; I want you to remember this: I appoint your father to
deliver the deeds." If it be true that Cornelius D. Vreeland
said on this occasion what these two witnesses swear he did, then
I think it must be regarded as certain that no delivery of these
deeds had been made up to that time, at least that no such
delivery had been made of them as imparted legal life to them.
If a previous delivery had been made or attempted that fact
would necessarily, according to the natural order of such an
affair, have formed a prominent part of the announcement which
the grandfather called his grandson to witness, and instead of
saying, as he did, that he wanted the defendant, after his death,
to take the deeds and deliver them, his recollection of what he
had previously done would have forced him to speak of the
deeds as already delivered. That fact was so directly and
inseparably associated with the evidence that the grantor was
then trying to make and preserve, that his failure to mention it
goes very far to justify the belief that it did not exist. But be
this as it may, this fact is clearly established: that although
nearly a year had elapsed since it is said the deeds were delivered,
they were still under the grantor's control. They were in his
box, and there they were to remain until after his death. His
language is, "in case of my death you are to take the deeds that
are in my box and deliver them as my agent." This was a plain
declaration that the deeds were his property and that he meant
to keep possession of them and exercise full control over them
so long as he lived.

Vreeland v. Vreeland.

That this was the fact is proved by other evidence. Just four months before Mr. Vreeland's death he and the defendant were at the barn on the homestead farm preparing a stall for a horse. The horse belonged to Mr. Vreeland. The defendant says his father said to him, that if he was taken away he wanted him to spend some money on the horse, for he thought the horse would make a trotter; and that he replied it was well enough for his father to say so, but he hadn't anything to show that the horse was his; and that his father then said: "Come to the house and we will fix that all right." When they reached the house, the defendant says, his father threw down a piece of paper and directed him to write as follows:

"March 6, 1890. With this deed I give to my son J. P. Vreeland all stock, farm utensils and money in bank, he to pay all my debts and settle my affairs. Should any one of my heirs object, then J. P. Vreeland is not to deliver this one's deed until such time as the heir objecting agrees to the above; and said heir is not to receive any money or income from the property so deeded to them."

The defendant says his father took the paper after it was written and signed it, and then said he would put it away, and that it would be found in the trunk with the deeds. He also says that the paper was found there after his father's death, pinned to the deed of the homestead farm. It is not pretended that the paper was delivered to the defendant either actually or constructively. As its language clearly demonstrates, it is testamentary in its character; it was not to go into effect until Mr. Vreeland was dead. It exhibits, as I think, in a very clear light the purpose with which Mr. Vreeland made the deeds. The language of the paper will bear but one interpretation. It declares, plainly and distinctly, that he made the deeds as a substitute for a will, and that they, like a will, should have no effect whatever until his death, and that, in the meantime, they, as well as the lands, should remain as completely subject to his dominion and control as though he had not made them. There is other evidence strongly supporting this view. With a single exception the deeds are absolute in terms, conveying an unconditional estate in fee, with a perfect right of present enjoyment. Nearly

all of them were signed and acknowledged in April, 1887 ; the grantor retained them in his hands undelivered for months afterward ; most of the lands, at the date of the deeds, were yielding rent; two of the tracts conveyed to the defendant were yielding over $3,000 a year; none of the deeds reserved rents; the defendant, however, says that his father always said that if he made out deeds for his property to his children he would keep the rents, as he had no other means of living, but that his father said nothing about reserving or keeping the rents, or retaining the possession of the lands when he delivered the deeds on the 9th of January, 1888. The fact that the deeds did not reserve either a life estate or rents furnishes very strong evidence that the grantor did not execute them with the intention of parting with them during his life, so as to make them effectual conveyances against himself. He undoubtedly meant that they should be effectual, after his death, as against his children, provided he did not change or destroy them, but his speech and conduct concerning them show very clearly, as I think, that he kept them in his possession for the very purpose of preserving to himself the right to change or destroy them, if he should at any time desire to do so. The fact that the deeds to the defendant do not reserve to his father what he admits his father always meant to retain, and what his father actually continued to enjoy up to the time of his death, when considered in connection with the facts just discussed, would seem to make it quite certain that his father never delivered his deeds to him with the intention to make them at once his property, and that he should at once, by force of such delivery, acquire title to the lands according to the terms of the deeds. It is an admitted fact in the case that Mr. Vreeland never intended that the deeds to the defendant should, during his life, have effect according to their terms.

Three or four witnesses have testified that Mr. Vreeland said to them, separately and at different times after the 9th of January, 1888, that he had deeded all his property to his children instead of making a will, and that he had given the defendant his deeds, and that the deeds to his other children would be delivered to them, after his death, by the defendant. This evi-

Vreeland *v.* Vreeland.

dence unquestionably strongly supports the truth of the defendant's story in its most vital part, but giving it its utmost effect—say that Mr. Vreeland spoke both accurately and truthfully when he made these declarations, and that these witnesses caught his exact meaning, and that they have reproduced on the witness-stand just what he said with perfect accuracy—still, I think it is manifest that it must be held that the proof falls far short of proving such a delivery of the deeds as made them valid and effectual conveyances. It is possible that some such transaction, as that which the defendant has described, took place between his father and himself on the 9th of January, 1888, but if it did, I am thoroughly convinced by the terms of the deeds themselves; by the manner in which his father subsequently dealt with and used the lands; by the fact that the deeds were always in his father's possession and subject to his control; also by the fact that his father actually directed one of the deeds to be redrawn and its provisions materially changed, thus treating it as his property and as completely subject to his will; and by the further fact that as late as four months preceding his death, his father dealt with the deeds as entirely subject to his control, by giving the defendant a writing, directing him not to deliver some of them unless the persons for whose benefit they were made would assent to a testamentary disposition he had attempted to make of a part of his personal property, that the defendant has not, in describing what was said and done on that eventful evening, told us all, withholding nothing and distorting nothing. The deeds were in the grantor's possession at the time of his death. This fact of itself makes them void. In such a condition of affairs, the court, before disinheriting the grantor's heirs, must be satisfied by convincing proof that the grantor, during his life, delivered the deeds with intent to give them instant effect according to their terms. It is not difficult to see what the truth is in this case. The undisputed facts all go to demonstrate, with almost absolute certainty, that the grantor meant that the deeds should take the place of a will and to have no effect until his death, meanwhile he retained possession of them so that he might change or destroy them if he desired to do so.

It must be adjudged that the deeds in question were never delivered.

After the death of their father, two of the complainants accepted the deeds made to them, and they afterward procured the defendant to relinquish, by deed, any right which he might subsequently take in the lands thereby conveyed under the trusts upon which they were conveyed. It is clear, however, that they did this in ignorance of the fact that the deeds had not been delivered; they, on the contrary, evidently believed that the deeds were valid and that they were bound by them. They have done nothing, therefore, which can be made the basis of an estoppel, or which should preclude them from obtaining their just rights. As to the lands situate in this state, the complainants are entitled to a decree adjudging that Cornelius D. Vreeland died seized of them, and that on his death they descended to his four children in equal shares.